# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION



FILED

DEC 17 2014

Clerk, U S District Court
District Of Montana
Billings

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JORDAN CAMPBELL-ZORN,

Defendant.

CR 14-41-BLG-SPW

OPINION and ORDER on
RESTITUTION

Defendant Jordan Campbell-Zorn ("Campbell-Zorn") pled guilty to one count of possession of child pornography in violation of 18 U.S.C. §2252A(a)(5)(B). He was sentenced on November 10, 2014. This Court reserved its restitution determination at that time. After reviewing the victims' restitution submissions, and what little argument the United States and Campbell-Zorn submitted on restitution in their briefs, this Court is now ready to rule.

For the reasons that follow, the Court hereby orders Campbell-Zorn to pay restitution in the amount of $23,825 in general restitution and $4,780.20 in attorney's fees and costs to "Angela" and $2,932.27 plus $203.84 in general restitution, and $1,500 in attorney's fees to "Jane Doe."

1

## I.   Background

The following facts are taken from the indictment, plea allocution, medical and psychiatric records submitted in connection with sentencing, and the pre-sentence report prepared by the Probation Office.   Between August 2012 and April 2013, law enforcement determined that Campbell-Zorn offered child pornography for distribution through the Gnutella network.   Law enforcement subsequently obtained a search warrant for Campbell-Zorn's residence and seized two computers and removable media from his bedroom.   Campbell-Zorn admitted that he stored child pornography images in the removable media that law enforcement discovered in his room.   A review of the images revealed 848 child pornography images and 344 child pornography videos.   Four of the victims depicted in the pornographic materials, "Angela," "Vicky," "Jane Doe," and "L.S.", all of whom have retained counsel, are actively seeking restitution in this case, as they have in many similar prosecutions across the United States.

On July 25, 2014, Campbell-Zorn pled guilty to one count of possession of child pornography, in violation of 18 U.S.C. §2252A(a)(5)(B) and (b)(2), pursuant to a written plea agreement.   "Vicky" submitted a restitution request of $27,500. "Jane Doe" submitted a restitution request of $26,500.   "L.S." submitted a restitution request of $150,000.   "Angela" submitted a restitution request of

2

$12,100.20- $16,520.20. Campbell-Zorn did not provide any substantial argument

or briefing regarding restitution. The Government requested restitution in the

amount of $3,000 for each victim, but has provided no justification for such an

award. The Government's request appears to be entirely arbitrary and is denied.

*See United States v. Wencewicz, et al.*, 2014 WL 5437057, at * 2 (D. Mont. Oct. 24,

2014) (citing *United States v. Miner*, 2014 WL 48162301, at *9 (N.D.N.Y. Sept. 25

2014)).

## II.   Legal Standard

In child pornography cases, restitution is mandatory to any person "harmed as

a result of" a defendant's crime. *See* 18 U.S.C. § 2259(a), (c). Restitution includes

"the full amount of the victim's losses," which includes any costs incurred by the

victim for:

(A) medical services relating to physical, psychiatric, or psychological care;
(B) physical or occupational therapy or rehabilitation;
(C) necessary transportation, temporary housing, and child care expenses;
(D) lost income;
(E) attorneys' fees, as well as other costs incurred; and
(F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3).

On April 23, 2014, the United States Supreme Court decided *Paroline v.*

*United States,* --- U.S. ---, 134 S.Ct. 1710 (2014), which held that restitution in child

pornography cases is limited to the losses proximately caused by the individual

3

defendant. District courts across the country have recently started applying *Paroline* but not without difficulty. Although the Supreme Court stressed that each defendant convicted of possessing child pornography should be assessed only for the degree to which his individual crime was the "proximate cause" of the victim's injury, the Court refused to establish a specific formula for the district courts to use to make this determination. *Id.* Instead, the Supreme Court said that the district courts must "do their best" to determine each defendant's respective liability. *Id.* at 1715.

*Paroline* provided the district courts with a rough framework to follow to assist them in making this determination. *Id.* at 1727-29. The Court explained that "where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant . . . . a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id.* at 1727. In other words, the defendant must first be convicted to establish that the defendant possessed images of the victim. Then, with respect to restitution, there must be proof that "a victim has outstanding losses caused by the continuing traffic in the images," "[like] costs of psychiatric treatment

4

and lost income, that stem from the ongoing traffic in her images as a whole." *Id.*

Then, the district court must determine how much restitution is appropriate in light

of those losses. *Id.* at 1727-28.

Of course, the defendant is responsible only for the losses to the victim that he

proximately caused. *Id.* at 1731 (noting that restitution is proper under § 2259

"only to the extent the defendant's offense proximately caused a victim's losses.").

*Paroline* set out the following factors for the district courts to consider in

determining the defendant's "relative causal role":

> the number of past criminal defendants found to have contributed to the
> victim's general losses; reasonable predictions of the number of future
> offenders likely to be caught and convicted for crimes contributing to the
> victim's general losses; any available and reasonably reliable estimate of the
> broader number of offenders involved (most of whom will, of course, never
> be caught or convicted); whether the defendant reproduced or distributed
> images of the victim; whether the defendant had any connection to the initial
> production of the images; how many images of the victim the defendant
> possessed; and other facts relevant to the defendant's relative causal role.

*Id.* at 1728. The Supreme Court cautioned, however, that these factors should only

serve the district court as "rough guideposts for determining an amount that fits the

offense." *Id.*

These tools provided by *Paroline*, while seemingly useful in a theoretical

sense, have proven to have very difficult, and very limited, practical application.

*See United States v. Dileo*, No. 12-260, 2014 WL 5841083, *5 (characterizing

5

application of the *Paroline* factors as "akin to piloting a small craft to safe harbor in a Nor'easter"); *United States v. Miner*, 1:14–CR–33 MAD, 2014 WL 4816230, at \*9 (N.D.N.Y. Sept.25, 2014) (noting difficulty in applying the Paroline framework and finding other district courts' concerns with the *Paroline* factors "well founded"); *United States v. Crisostomi,* No. 12–166, 2014 WL 3510215, \*2 (D.R.I. July 16, 2014) (explaining that "while some of the *Paroline* factors are determinable with some precision, a number of other factors are virtually unknown and unknowable, regardless of the detail available in the record"). Rather than attempt to forge yet another path through the bramble bush that is the *Paroline* "framework," this Court relies heavily on analytical paths already beaten by other district courts that have struggled with this determination.

## III. Discussion

### A. Proximate Causation

Since Campbell-Zorn, by his own admission during his plea, "possessed [the] victims' images," *id.* at 1727, the first step of showing that the defendant possessed the victim's images is met for all of the victims requesting restitution. Next, the Court must determine whether the victims' losses were the "proximate result" of Campbell-Zorn's offense. *Id.* at 1720. Campbell-Zorn, like the defendant in *Paroline*, was convicted of knowingly possessing child pornography in violation of

6

18 U.S.C. § 2252, an offense involving the "sexual exploitation of children and child pornography[.]" *Id.* at 1718. Because Campbell-Zorn committed the same offense as the defendant in *Paroline*, that case is instructive on whether the proximate cause requirement is met under such circumstances.

In *Paroline*, the Supreme Court summarized the proximate cause analysis with respect to child pornography possession offenses, stating, "[t]he unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse [] plays a part in sustaining and aggravating this tragedy. . . . In a sense, every viewing of child pornography is a repetition of the victim's abuse." *Id.* at 1726-27; *see also New York v. Ferber*, 458 U.S. 747, 759 (1982) ("the materials produced [in child pornography] are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation). It is undisputed that Campbell-Zorn received images of "Vicky," "L.S.," "Jane Doe," and "Angela." Thus, he "play[ed] a part in sustaining and exacerbating the harm" to these victims. *Paroline*, 134 S.Ct. at 1726. Accordingly, this Court finds that here, like in *Paroline*, the proximate cause element is met.

## B. Proper Restitution Amounts

Next, this Court must determine the proper amount of restitution Campell-Zorn must pay each victim. According to the Supreme Court, the amount

of restitution "would not be severe in a case like this, given the nature of the causal connection between the conduct" of Campbell-Zorn as one possessor of images of "Vicky," "Angela," "L.S.," and "Jane Doe" and "the entirety of their losses from the trade in their images, which are the product of the acts" of at least hundreds of offenders. *Paroline*, 132 S.Ct. at 1727. But, at the same time, the restitution amount should not be a "token or nominal amount" either. *Id.*

## 1. Total amount of the victim's losses caused by the continuing traffic in the victims' images

Under *Paroline*, "as a starting point," district courts should determine the amount of the victim's losses "caused by the continuing traffic in the victim's images" and then set an award of restitution "in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id.* at 1728. But in *United States v. Reynolds*, No. 12-20843, 2014 WL 4187926, United States District Court Judge Cox identified a significant shortcoming of this "starting point." *Id.* at *5. That is,

[t]he victim in *Paroline*, "Amy," was eight or nine years old when she was sexually abused by a relative in order to produce child pornography. *Paroline*, 134 S.Ct. at 1717. The abusive relative was prosecuted and Amy received therapy beginning in 1998. By the end of 1999, Amy's therapist noted that she was "back to normal" and that "her involvement in dance and other age-appropriate activities, and the support of her family, justified an optimistic assessment." *Id.* Later in her teenage years, however, Amy learned that images of her abuse were being trafficked on the internet and were available nationwide. "The

8

knowledge that her images were circulated far and wide renewed the victim's trauma and made it difficult for her to recover from her abuse." *Id.* Upon remand, the district court could presumably determine the amount of losses that were caused by the continuing traffic in her images—as opposed to losses that occurred from the initial abuse. But that only seems possible in the rather unique situation presented in Paroline **where there is some kind of demarcation between the losses from the initial abuse and the losses from continued trafficking.**

*Id.* (emphasis added).

This Court is in the same position as Judge Cox in *Reynolds*. There is no demarcation between "L.S.'," "Vicky's," "Jane Doe's," and "Angela's" losses stemming from their initial abuse and the losses they have sustained from the continued trafficking of their images. Without this demarcation, using the "starting point" as instructed in *Paroline* would result in Campbell-Zorn being held responsible for losses that he did not proximately cause, including those originating from the victims' actual abuse, which violates a different directive from *Paroline*. *See Reynolds* at \*6 ("Reynolds should not be ordered to pay restitution for medical care that Cindy received several years before Reynolds ever possessed her images[.]"). Accordingly, *Paroline's* suggested "starting point" for determining the victims' losses incurred due to the continuing traffic in their images is unusable when the victims' losses from the actual sexual abuse have not been resolved.

9

In *Wencewicz*, after analyzing other recent district courts' attempts to calculate a victim's "general losses" caused by one defendant in light of the "continuing traffic" of a victim's image, United States District Court Judge Donald Molloy came up with the following equation:

> The amount of psychological treatment/counseling costs following the offense conduct;
>
> PLUS
>
> Educational and/or vocational losses following the offense conduct;
>
> MINUS
>
> Those costs directly related to another defendant or litigation;
>
> PLUS
>
> Costs arising after the offense conduct that are impossible to trace to an individual defendant alone (e.g. cost of evaluation)
>
> = General Losses.

2014 WL 5437057 at *3. Relying on *United States v. Gamble*, 709 F.3d 541, 554 (6th Cir. 2013), Judge Molloy took the amount of general losses and divided that amount by the number of restitution orders previously entered for each victim to determine the amount of each victim's general losses for which the defendant was responsible. *Id.* at *5. This Court is persuaded by Judge Molloy's analysis because it more appropriately takes into consideration those events for which an individual defendant may not be responsible, especially when no demarcation exists

between losses attributable to a victim's original abuse and her losses attributable to the continued trafficking of her image.

### a. "Angela"

In *Wencewicz*, Judge Molloy applied the above equation to determine restitution amounts for victims "Angela" and "L.S." Accordingly, this Court adopts Judge Molloy's analysis in *Wencewicz* with respect to those two victims.

"Angela" has requested $11,980.20–$16,400.20 in restitution from Campbell-Zorn. As she did in *Wencewicz*, "Angela" provided an expert report from Alexandria H. Doyle, Ph.D., dated May 7, 2014, which shows that currently, at age 12, "Angela" suffers from psychological injuries including post-traumatic stress, major depressive disorder, and unspecified attention deficit disorder as a result of the sexual abuse documented in her images found online. (Rest. Ltr., Report at 5). These psychological injuries have been and continue to be aggravated by the continued distribution and online viewing of her abuse. (*Id.*)

The report also shows that the costs associated with "Angela's" continued treatment and care are, at least in part, related not only to the initial abuse, but to the continuing traffic in her image, as she "is fearful that ... the consumers of pornography in which she is the object will find her and rape her." (*Id.* at 3.) The report outlines how "Angela's" knowledge that other men have her photos and the

notification of such possession "creates distress for her mother as well as her as she is reminded of being abused and exploited," and causes her distress that she "is the object of other's perversions and worries about the risks it poses to her. This contributes to the feeling that additional trauma could face her." (*Id.* at 4.)

"Angela's" counsel has submitted the same documentation to this Court that he submitted to Judge Molloy in *Wencewicz*. That documentation estimates "Angela's" total covered losses over the next twenty years to be $183,000 to $293,000 and, over her lifetime, $366,000 to $587,000. (Rest. Request at 4.) The monetary data is dated March 2014. (*Id.*) Taking the mid-point of the $366,000 to $587,000 range estimated by Dr. Doyle, the Court finds "Angela's" future treatment costs to be $476,500. *See also Wencewicz* at *3 (citing *United States v. Watkins*, 2014 WL 3966381, at *6 (E.D.Cal. Aug. 12, 2014)(taking the average of the high/low estimates submitted by the victim); *United States v. Hernandez*, 2014 WL 2987665, at *9 (E.D.Cal. July 1, 2014) (same)). "Angela" has not made a request for education or vocational losses and she has not presented any post-conduct costs that are impossible to trace to any individual defendant alone. Accordingly, the total amount of "Angela's" general losses is $476,500.

Turning to Campbell-Zorn's relative role in bringing about "Angela's" losses and following the *Wencewicz* approach, this Court must start by dividing "Angela's"

12

general losses by the number of restitution orders that have previously been entered. Here, post-*Paroline* restitution orders have been entered in 20 previous cases involving "Angela": $476,500 divided by 20 results in an apportionment of general losses of $23,825.

Applying the *Paroline* factors used to determine Campbell-Zorn's relative causal role does not impact "Angela's" restitution amount. Pure speculation is the only way to know the number of past criminal defendants found to have "contributed" to "Angela's" general losses, and there is no way to predict the number of future offenders likely to be caught and convicted for crimes contributing to her general losses or to estimate "the broader number of offenders involved[.]" *Paroline*, 134 S.Ct. at 1728.

Because Campbell-Zorn possessed the victim's images through the Gnutella network, he was capable of receiving and distributing "Angela's" images. There is no evidence before the Court, however, that Campbell-Zorn ever actually reproduced or distributed images of "Angela", or any other restitution victim. Campbell-Zorn did not have any connection to the initial production of the images and it is unknown how many images of each victim, respectively, that he possessed. Accordingly, the *Paroline* factors provide no insight into Campbell-Zorn's relative causal role and therefore do not enhance the restitution amount.

"Angela" has provided an estimated amount of $4,780.20 in attorneys' fees and costs arising out of her restitution request in this case. Her counsel provided an affidavit with an itemized breakdown of the costs associated specifically with the request in this case. (Rest. Ltr., Aff.). Because attorneys' fees are traceable to particular cases involving specific defendants, they are not included in the general losses to be apportioned among defendants. *See Paroline*, 134 S.Ct. at 1727. In summary, "Angela" is entitled to $23,825 in general restitution, and $4,780.20 in attorney's fees and costs.

### b. "L.S."

"L.S." has requested restitution in the amount of $150,000. (Rest. Ltr. at 2). "L.S." was the minor victim depicted in the "Jan_Feb Series" discovered in Campbell-Zorn's possession. (*Id.*) "L.S.'s" counsel provided ample documentation reflecting that this series has been actively traded since 2005 and is recognized by law enforcement authorities as "one of the most prolific and widely-traded images series via the internet." (*Id.* at 3.) However, the restitution packet "L.S." submitted does not include any up-to-date information, i.e., what losses were sustained after the instant offense and makes no reference to any of the analysis outlined in *Paroline*. (*See gen. id.*). Like in *Wencewicz*, the absence of information regarding costs incurred after the offense conduct in this case leaves the

14

Court with no reasonable basis for calculating those losses fairly attributable to Campbell-Zorn. *See Wencewicz,* 2014 WL 5437057 at \*4 (citing *Gamble,* 709 F.3d at 554) ("As a logical matter, a defendant generally cannot cause harm prior to the date of his offense."); *United States v. Galan,* 2014 WL 3474901, at \*7 (D.Or. July 11, 2014) (denying restitution request on basis of outdated and generalized cost assessments)).

The information "L.S." provided lacks the specificity necessary to attribute specific losses to Campbell-Zorn. *See Galan,* at \*8. Like in *Wencewicz,* here there is no breakdown of what the mental, emotional and psychological damage will cost "L.S." over time, whether any of those costs have been paid previously by other defendants, or how the costs are attributable specifically to Campbell-Zorn's conduct. Without this specificity, "L.S.'s" request for $150,000 appears entirely arbitrary. Accordingly, "L.S.'s" request for restitution is denied.

### c. "Jane Doe"

"Jane Doe" has requested $25,000 in general restitution from Campbell-Zorn and $1,500 in attorney's fees. (Rest. Ltr. at 2). Beginning when she was four or five years old, "Jane Doe" was abused over a six to seven year period by her biological father. (Rest. Ltr. at 3). Her father produced videos and images of "Jane Doe's" sexual abuse, images that included bestiality, bondage, intercourse

15

with an adult male, sodomy and vaginal penetration by a dildo. (*Id.* at 11). These images are included in the "Marineland" series and are traded on the internet. (Rest. Ltr., Report).

"Jane Doe" provided an expert report from Randall Green, Ph.D., dated July 7, 2014. (Rest. Ltr., Report). According to Dr. Green, "Jane Doe" suffers from psychological injuries including post-traumatic stress, generalized anxiety disorder, and persistent depressive disorder as a result of the sexual abuse documented in her images online. (*Id.* at 27). The report also shows that the costs associated with "Jane Doe's" continued treatment and care are, at least in part, related not only to the initial abuse, but to the continuing traffic in her image, as "[t]he discovery of multiple downloaders and distributors of her images effectively exponentially multiplied in her mind the sick and dangerous males "out there" who might be obsessed or fixated on her and do her harm." (*Id.* at 28).

Dr. Green determined that "Jane Doe's" ongoing distress stems from the fact that "[e]very downloader and/or distributor represents to her a danger and a threat, causing an accumulative effect upon an already weakened psychological foundation." (*Id.*) Thus, according to Dr. Green, "Jane Doe" "daily suffers psychological damage from the knowledge of the existence of those individuals who have downloaded her images." (*Id.*)

"Jane Doe's" counsel has submitted documentation that estimates "Jane Doe's" total covered losses to be, over her lifetime, between $265,710 and $303,150 plus $19,772.23 in "expenses relative to restitution documentation." (Rest. Ltr. at 2.) These expenses include obtaining two expert reports, travel to see "Jane Doe", and acquisition of medical records. (*Id.*, Ex. 7).

Applying the *Wencewicz* analysis and taking the mid-point of the $265,710 – $303,150 range estimated by Dr. Green, the Court finds "Jane Doe's" future treatment costs to be $284,430. "Jane Doe" did not make any request for education or vocational losses and she did not present any post-conduct costs that are impossible to trace to any individual victim alone. Accordingly, the total amount of "Jane Doe's" general losses is $284,430.

Turning to Campbell-Zorn's relative role in bringing about "Jane Doe's" losses and following the *Wencewicz* approach, this Court begins by dividing her general losses by the number of restitution orders that have previously been entered. Here, no post-*Paroline* restitution orders have been entered because "Jane Doe" just recently calculated her losses. (Rest. Ltr. at 2). Holding Campbell-Zorn alone responsible for her total losses in light of this fact would be a mistake, however. According to Dr. Green's report, "[w]hen Jane's images were provided to the National Center for Missing and Exploited Children []" a report generated on

17

November 6, 2007, indicated 97 cases for "Marineland" were identified. (Report at 19).

The existence of at least 97 cases involving "Jane Doe's" images means that this Court cannot hold Campbell-Zorn solely responsible for the continuing trafficking of "Jane Doe's" images. The 97 other cases provide this Court with relevant information to consider the *Paroline* factors. Of course, the number of cases involving defendants who possessed the "Marineland" series has undoubtedly grown since 2007. On the other hand, "Jane Doe" reported that, as of October 1, 2014, no other defendant has been ordered to pay restitution to her. (Rest. Ltr. at 2).

The Court does not know why no restitution has been ordered to "Jane Doe" in over seven years. Perhaps it is because she just recently calculated her losses and has only now begun seeking restitution. Perhaps it is some other reason. Nonetheless, dividing "Jane Doe's" losses by the 97 documented cases involving her images seems to be the most effective way to achieve the purposes of *Paroline*. Certainly it encompasses the number of known defendants who are implicated in trafficking "Jane Doe's" image. The fact that some of those defendants may not have been ordered to pay restitution is offset by the future defendants who will be ordered to do so.

Accordingly, "Jane Doe's" total losses, $284,430, divided by 97 results in an apportionment of general losses of $2,932.27. Since the "costs and expenses" "Jane Doe" associated with her restitution requests resulted in materials like Dr. Green's report, which may form the bases for her losses in all subsequent restitution requests, the Court will also divide those costs, $19,772.23 by 97, resulting in an additional $203.84 attributable to Campbell-Zorn.

Applying the *Paroline* factors used to determine Campbell-Zorn's relative role does not impact "Jane Doe's" restitution amount. As noted above, no orders of restitution have been entered in her favor, and there has not yet been a finding that any other defendant has contributed to her losses. "Jane Doe's" counsel states that there is "no way of predicting" the number of future offenders or the number of defendants who will contribute to her losses. (Rest. Ltr. at 8). Again, these factors provide no insight into Campbell-Zorn's relative causal role.

Because Campbell-Zorn possessed the victim's images through the Gnutella network, he was capable of receiving and distributing "Jane Doe's" images. There is no evidence before the Court, however, that Campbell-Zorn ever reproduced or distributed images of "Jane Doe". Campbell-Zorn did not have any connection to the initial production of the images and it is unknown how many images of each victim, respectively, that he possessed. Accordingly, the *Paroline* factors do not

impact Campbell-Zorn's relative causal role or the restitution amount.

Finally, "Jane Doe" has requested an additional $1,500 in attorneys' fees. (Rest. Ltr. at 2, 12). Nowhere in her request, however, did her counsel itemize or breakdown the amount of time she spent on this case. In her affidavit, "Jane Doe's" counsel swore that she bills out at $350/per hour, which assumes that she spent 5 hours on "Jane Doe's" case. (Rest. Ltr, Aff.). In light of the documentation provided, this number seems reasonable. Attorneys' fees are traceable to particular cases involving specific defendants, and thus are not included in the general losses to be apportioned among defendants. *See Paroline*, 134 S.Ct. at 1727. In summary, "Jane Doe" is entitled to $2,932.27 plus $203.84 in general restitution, and $1,500 in attorney's fees.

### d. "Vicky"

"Vicky" has requested $25,000 in general restitution from Campbell-Zorn in this case and $2,500 in attorney's fees. When "Vicky" was a young child, she was subjected to sexual abuse by her biological father. Her father produced videos and images of "Vicky's" sexual abuse, where he engaged in vaginal and anal intercourse and oral sex with her, often while she was bound. The resulting pornography, known as the ""Vicky" series," is widely circulated across the internet. *United States v. McIntosh*, No. 4:14 CR 28, 2014 WL 5422215, *1 (E.D. Va. Oct. 22, 2014).

"Vicky" has requested $25,000 in general restitution and $2,500 in attorney's fees. (Rest. Ltr. at 2). Her counsel asserted that the full amount of "Vicky's" losses include $113,600 in future counseling expenses, $53,330 in educational and vocational counseling needs and lost part-time income during schooling, $828,150 in lost earnings, and $88,973.29 in out of pocket expenses relative to restitution documentation, totaling $1,084,053.29. *Id.* No documentation supporting these numbers was provided to the Court by the United States or Probation, however.

In her letter, "Vicky's" counsel suggested that the Court award $25,000 in compensatory loss along with $2,500 in attorney's fees based on the proposed "Amy and Vicky Child Pornography Restitution Act, S. 2301" introduced in the United States Senate by Senators Orrin Hatch and Charles Schumer. (Rest. Ltr. at 4). "Vicky's" counsel made this same argument in *United States v. Dileo*, No. 12-CR-260 ENV, 2014 WL 5841083 (E.D.N.Y. Nov. 4, 2014). The argument was not favorably received. District Judge Vitaliano pointed out that not only is the proposed bill not law, the legislation appears to "conflate restitution with a fine", in a scheme "so far removed from the traditional concepts of restitution and out of harmony with the dictates of [ ] *Paroline*, that, absent statutory enactment, it cannot be used to model the common law development of restitution in the child pornography context." *Id.* at *8.

This Court agrees with Judge Vitaliano. As it now stands, the purpose behind § 2259 is "to ensure full restitution to the victim" and to "hold the defendant responsible for the damage he caused" so that "liability is apportioned in a reasonable way that leads to full restitution without eviscerating the causation requirement." *Gamble*, 709 F.3d. at 552. Establishing a "minimum" loss schedule that fails to consider the actual loss amounts suffered by the victim or caused by each individual defendant directly as suggested in the "Amy and Vicky Child Pornography Restitution Act" contravenes the mandate in *Paroline* to tailor the restitution amount to the victim's losses and the defendant's relative causal role. This Court may not disregard Supreme Court's directive in *Paroline* based on proposed legislation.

Without any additional materials to consider "Vicky's" losses and to what extent they were caused by Campbell-Zorn's conduct, this Court cannot sufficiently analyze "Vicky's" claim under *Paroline* nor can it adequately determine her losses. Like in "L.S.'s" case, without any additional information, there is no breakdown of what the mental, emotional and psychological damage will cost "Vicky" over time, whether any of those costs have been paid previously by other defendants, or how the costs are attributable specifically to Campbell-Zorn's conduct. In other words, "Vicky" has not proven her losses. Without this specificity, "Vicky's" request for

$25,000 appears entirely arbitrary and is denied.

## IV.    Conclusion

For the foregoing reasons, the Court, pursuant to 18 U.S.C. § 2259, orders that

the defendant, Jordan Campbell-Zorn, pay restitution in the amount of $23,825 in

general restitution, and $4,780.20 in attorney's fees and costs to "Angela" and

$2,932.27 plus $203.84 in general restitution, and $1,500 in attorney's fees to "Jane

Doe."

DATED this _17th_ day of December, 2014.

_Susan P. Watters_
SUSAN P. WATTERS
U.S. District Court Judge